## CIRCUIT COURT OF LANCASTER COUNTY

Mitchell J. Alga, Sr.,
Executor of the Estate of
Essie H. Lawson

v.

Vega & Associates, Inc.,
and G. Raynor Dunton, III

August 23, 1989

Case No. (Chancery) 97-1989

By JUDGE JOSEPH E. SPRUILL, JR.

The principal issue in this chancery action is the correctness of the decision of the Executor of the Estate of Essie H. Lawson to terminate the first refusal for the purchase of a tract of land in Lancaster County, Virginia, granted by Mrs. Lawson in her will to G. R. Dunton, III.

The facts are relatively free of conflict. Mrs. Lawson died in March, 1988, and in Article V of her will (which was executed by her on October 10, 1986), she provided as follows:

## ARTICLE V

I direct my Executor to sell, at fair market value, the seventy-one (71) acres, more or less, on the Rappahannock River and home place located thereon. First refusal for the purchase to be given to G. R. Dunton, III, of Wilmington, Delaware. The net proceeds of the sale, after all expenses appertaining thereto and all expenses of administration of the estate, are to be distributed equally, share and share alike, to the following: Ella Mae Turlington, Anne Long Whay, Edwin Jackson Long, Betty Long Ball, Frances Long Trimmer, Mary Ida Newcomb.

On March 18, 1988, her executor, Mitchell J. Alga, wrote Dunton informing him of his right of first refusal. Dunton testified that he had been unaware that such a provision had been made for him by Mrs. Lawson, a long-time family friend. In this same letter, the executor advised Dunton that he had asked "two competent appraisers" to appraise the property to determine the fair market value. The executor further advised Dunton that "No action is necessary on your part at this time."

Dunton responded on March 22, 1988, informing the executor of the desire of "Miss Essie and Captain Eddie" (her deceased husband) to keep the property intact and in family hands and stated that he was "very interested in purchasing Miss Essie's estate."

The executor obtained appraisals from two qualified appraisers, each dated May 24, 1988, in the amounts of $600,000.00 and $675,000.00, respectively.

Notwithstanding the appraisals, on July 7, 1988, the executor wrote to Dunton and informed him that the price of the property was $1,200,000.00 and gave Dunton until July 22, 1988, to accept. On July 18, 1988, Dunton confirmed his interest in purchasing the property and advised that ninety days would be needed to arrange financing. The executor wrote Dunton on July 22, 1988, that a contract would be sent to him providing for a $25,000.00 deposit with a ninety-day closing date.

On July 26, 1988, Anne L. Whay, a real estate agent and beneficiary of one-sixth of the net proceeds of this

sale, sent Dunton at the executor's request a standard form real estate contract (under which Whay was to receive a $5,000.00 commission) for the sale of the property at $1,200,000.00.

On July 27, 1988, Dunton wrote the executor explaining that because he had little experience in "real estate dealings," he had obtained legal advice from a lawyer in the White Stone area. Dunton testified that he was a chemist and had, save for his home, never been involved in a real estate transaction. He was advised by his legal counsel, as stated in the July 27th letter, that he could buy the property at a price set forth in a legitimate offer, or if no offer had been made, he could make an offer. He asked the executor to provide the appraisals obtained by the executor. This letter was not answered by the executor, and the appraisals were not provided. Indeed, the appraisals presumably did not come to light until the trial on July 7, 1989.

By agreement dated September 16, 1988, the executor contracted to sell the subject property to Vega & Associates, Inc., a northern Virginia development company, for $1,000,000.00. The contract provided for real estate commissions of $70,000.00. Vega made a $25,000.00 deposit upon signing this contract.

On September 23rd, the executor wrote Dunton informing him of the Vega contract and giving him ten days to exercise his first right of refusal, to commence upon receipt of the letter, which was September 26, 1988. Dunton received this letter as he was leaving his home for a business trip. Nevertheless, he telephoned the executor en route, informed him of his continuing desire and intention to exercise his right of refusal, and asking for additional time. On Thursday, October 6, 1988, Dunton telegraphed the executor exercising his right of refusal and agreeing to the terms of the Vega contract. Western Union telephoned the executor on October 6th, and not being able to reach him, read the contents of the telegram to the executor's secretary. The executor acknowledged receiving this message on Friday, October 7th. On Monday, October 10, 1988, the telegram was delivered to executor.

In the meantime, executor, on October 7, 1988, wrote Dunton that he, the executor, had terminated Dunton's right of first refusal. Thereafter, the executor worked

extensively with Vega in obtaining various permits and appraisals needed to develop the property as a subdivision.

On October 10, 1988, the same day Dunton's telegram of October 6th was delivered, Alga wrote the realtor stating that Dunton's rights were terminated and that Vega had "the primary contract."

During the ten-day period, Dunton called Alga several times asking for more time. Alga refused, claiming pressure from the heirs to settle and the refusal of Vega to extend.

On October 22nd, Dunton wrote Alga that his attorney was concerned about how his rights were "dealt with" and that "more than likely an injunction will be filed."

On December 12, 1988, Vega requested a thirty-day extension of settlement. The next day, the executor granted an extension of approximately fifty days. Settlement in the Vega contract was set ultimately for February 15, 1989.

Vega, through his counsel, from time to time during this period, expressed concern about the status of Dunton's right of refusal, and finally, because of potential title problems, requested a written waiver from Dunton. The executor continued to assure Vega that Dunton's rights were terminated, and Vega continued to rely on these assurances as development plans ensued.

On February 9, 1989, Dunton's counsel hand delivered to the executor notice of Dunton's exercise of his right of refusal, enclosing a contract reflecting substantially the same terms as the Vega contract, and a cashier's check for $25,000.00 to the executor as a deposit. The executor was requested to inform Vega of Dunton's intention.

The next day, on February 10, 1989, to alleviate Vega's concerns about Dunton's rights, and presumably to induce a title insurance company to insure the title to the property, the executor executed an affidavit in which he, the executor, declared, under oath, that Dunton's rights were terminated and that Dunton had made no effort to sign any instruments or to make a good faith deposit.

On February 15, 1989, at the settlement table, Vega learned that Dunton disputed the executor's determination that his rights were terminated. Despite the executor's insistence that Vega close, Vega refused to do so because of these revelations.

On March 15, 1989, the executor returned to Dunton's counsel his $25,000.00 deposit and his contract, and on the same date, the executor filed this action for Declaratory Judgment praying, *inter alia*, that Dunton's right of first refusal is waived or terminated and that specific performance of the Vega contract be granted. Dunton answers and by Cross-Bill asks that the right of first refusal be declared duly exercised by him, that the executor be ordered to convey the subject property to him, that the net price due the estate be determined, and that he be awarded his costs and reasonable attorney's fees. Vega answers and by Cross-Bill asks, *inter alia*, the Court to declare the Vega contract "operative," but if Dunton's right of refusal is found to have been validly exercised, that the Court find the executor has breached Vega's contract and has intentionally misrepresented essential facts upon which Vega relied, entitling Vega to damages for out-of-pocket expenses and costs, loss of profits, attorneys fees, and a return of deposit.

A determination of the central issue, i.e., what are Dunton's rights, requires consideration of several subsidiary issues. For example, what authority does the executor in these circumstances have to declare a right of refusal terminated; at what point was Dunton required to act; is ten days a reasonable time; did Dunton act within such time; what are Vega's rights?

It will be helpful, in understanding the Court's analysis, to review certain elementary rules.

An executor holds a position of trust and confidence. He has an affirmative duty to exercise highest fidelity and utmost good faith in dealing with his estate. In the discharge of these duties, he is required to exercise that degree of care and diligence that prudent persons ordinarily exercise under like circumstances in their own personal affairs. It is axiomatic that he must make every effort to carry out the testator's intention, for his primary responsibility in administering the estate is to fulfill the wishes of the decedent. *Clare v. Grasty*, 213 Va. 165 (1972).

The executor acts in a representative capacity. In a sense, he occupies a dual role, being not only the personal representative of the decedent, but also, to a very great extent, the representative of all those who

have an interest in the estate. 33 C.J.S., *Executors and Administrators*, section 142, p. 1101. This relationship presupposes a duty to act with fairness, to advise, to fully disclose, and to be impartial.

Thus, the Court believes the issues here should not be decided solely upon the application of the law of commercial contracts. This is not to suggest a different result would be reached if this were done. Rather, there is a transcendent element here which ought to be recognized, that being the special duties inherent in the office of personal representative.

### Has Dunton, By His Conduct, Waived or Forfeited His Right of Refusal?

In *Lake of the Woods Assoc. v. McHugh*, 238 Va. 1 (1989), (decided June 9, 1989), our Virginia Supreme Court held a right of first refusal is an interest in property and not merely a contract right. The holder of such a right has an equitable interest in the property. The Court quotes with approval as follows: "In this area of property law, vested rights and settled expectations are at stake."

If the right is an interest in property, it would follow that it affects the marketability of the title to the property. Alga claims to be in a position to convey good title to Vega. Alga comes to this conclusion presumably because he confers upon himself the authority to terminate, at his discretion, the right given Dunton by Mrs. Lawson. This Court does not believe that what Mrs. Lawson gives, her executor can take away. The will could have provided when the right would terminate, but it did not. Dunton could agree to waive his right, but he did not. Therefore, the executor's remedy if he wished to convey to some other party would be to petition the Court for a declaration. If Alga could, in his unfettered discretion, terminate after ten days, could he after seven days, or three days? Is Alga's notion of reasonableness the standard? If so, Dunton's grant is merely illusory.

The Court concludes that Alga, as executor, acting independently, was without authority to terminate Dunton's rights.

This holding notwithstanding, has Dunton's conduct manifested such indifference or neglect that he has waived or forfeited his right? When was Dunton first obligated to act?

In *Landa v. Century 21*, 237 Va. 374 (1989), the Court quoted with approval from its earlier decision in *Cities Service v. Estes*, 208 Va. 44 (1967), that:

> it (a right of first refusal) requires the owner, when or if he decides to sell, to offer the property first to the person entitled to the right of first refusal . . . .
>     A right of first refusal is inserted in a contract for the benefit of the person who is given the right and it . . . must, therefore, be interpreted with that purpose in mind.

The Supreme Court, in *Landa*, further quotes Professor Corbin:

> where a right of first refusal is involved, when an owner receives an offer, the owner cannot accept that offer without first offering it to the holder of the right of refusal "on the same terms." If he does not do this, the owner is in breach.

The executor was obligated under the will to offer the property to Dunton at its fair market value. This the executor failed to do. If the executor claims this obligation was satisfied by the $1,200,000.00 proposal of July, 1988, the executor is mistaken. The executor cannot claim $1,200,000.00 was the fair market value when this is twice the value reflected by his own independent appraisals obtained six weeks earlier, and $200,000.00 more than his contract with Vega.

Before the executor entered into a contract with Vega, he should have notified Dunton of the terms Vega was willing to meet and given Dunton a reasonable time to accept or reject. Instead, the executor, knowing of Dunton's continuing interest, nevertheless contracted to sell to Vega, obligating the estate for substantial commissions.

Paragraph 29 of the Vega contract provides as follows:

29. *Right of Refusal*: This contract is contingent for ten (10) days upon Mr. G. Raynor Dunton to exercise his option of first right of refusal in writing.

The executor here is in breach, following *Landa*, because he in effect accepted Vega's offer before Dunton had an opportunity to act on it. However, assuming, *arguendo*, that the contingency in paragraph 29 is sufficient to satisfy the requirements of *Landa*, we come to the question of whether ten days is a reasonable time within which to exercise the right of refusal.

Article V of the will is explicit in giving Dunton the right of first refusal. Better draftsmanship would have prescribed precisely how and within what time limits this right was to have been exercised. Unfortunately, the will is silent as to these material terms. The Court therefore becomes, in effect, the gap-filler, implying terms not only because they are fair and reasonable, but also because the testator must have intended them and failed to express them and because they are necessary to give business efficacy to the provision as written. The grant is explicit; implicit is a fair and reasonable opportunity to exercise it.

The Court should interpret the will in a manner that, if possible, gives effect to the testator's intentions. Her intentions are the essence of the issues before the Court.

In determining whether ten days is a reasonable time, we must consider all relevant circumstances existing when the ten-day limitation was given. The property is in Lancaster County, Virginia; Dunton was working as a chemist in Delaware; the executor had, up to that time, given Dunton no appraisals, or any other data to indicate the value of the property; and $1,000,000.00 is a large amount of money. Upon receipt of notification from the executor, Dunton had to satisfy himself that $1,000,000.00 was representative of the fair market value, decide whether he wanted to purchase at that price, and if so, arrange financing. By almost any fair standard, ten days was an

unreasonable time within which to expect that this could be accomplished.

Perhaps the most compelling evidence that ten days was too short a time is reflected by the fact that no person involved in these transactions was willing to take credit for establishing it. Alga, Whay, Ghadban (for Vega) and Bonner all testified as to their involvement, and all disavowed any responsibility for the ten-day limitation. Bonner was emphatic and convincing in designating Alga as the source.

The Court holds that ten days was an unreasonable limitation under these circumstances.

On the tenth day, Dunton accepted the terms of the Vega contract. Alga acknowledged receiving verbal confirmation of Dunton's acceptance on October 7th (Friday) and the mailgram on October 10th. On October 7th, Alga notified Dunton that his rights were terminated. Dunton's counsel argues that this is analogous to anticipatory repudiation by the executor and that Dunton was not obligated thereafter to tender performance. We agree. Dunton was justified on concluding, upon receipt of Alga's notice, that submission of a deposit and contract was useless. In the event of anticipatory breach, Dunton had the right, following *Simpson v. Scott*, 189 Va. 392 (1949), "according to practically all the authorities, to await the time for performance and bring suit when that time has arrived . . . ."

The Court has studied *Smith v. Hevro Realty*, 507 A.2d 980 (Conn. 1986), relied on by Alga's counsel. Here, the holder of the right of first refusal declined to make the required deposit until he was presented a contract. The Connecticut court concluded as a matter of law that no contract was necessary and that the holder of the right was wrong to insist upon a contract as a precondition to making the deposit. The court found that the owner adhered strictly to the terms of the agreement containing the right of refusal. Therefore, the right was lost. This is a factually different case and has no application here. It is instructive to note, however, that in *Hevro*, the right of refusal was more specifically drafted, that a thirty-day time limit was given (even though the grantee of the right was a tenant of the premises), that after the grantee indicated a desire to exercise the right,

additional time was given, and finally, there was no unilateral termination of the right by the owner.

The tenor of the executor's testimony was that Dunton throughout procrastinated, vacillated, and failed to communicate, to the point that executor felt justified in terminating his rights. The record does not support this conclusion. Three letters were sent by Alga to Dunton between the time of Mrs. Lawson's death and the Vega contract. Dunton responded to each promptly. Additionally, there were a number of telephone calls between the two. On September 23rd, Dunton was given his ten-day notice, to which he responded with several telephone calls and by mailgram of October 6th. The only unanswered correspondence, from the record, is Dunton's July 27th request of Alga for the appraisals.

The executor seems to have assumed that Dunton was financially unable to make this purchase. Again, this assumption is not supported by the testimony. Dunton has stated unequivocally that he is financially able and ready to purchase.

Vega's counsel argues that Dunton should be equitably estopped from exercising his right of refusal because Dunton was charged with knowledge that Vega was proceeding with development plans. Dunton, claims Vega, induced Vega to believe he had waived his rights, thereby encouraging Vega to proceed. Dunton, implied Vega, had a duty to warn Vega. There is no evidence of misrepresentation or deception (even if unintentional) by Dunton nor any reliance by Vega on Dunton's actions or inactions. Vega clearly relied on the representations of Alga, not Dunton. Dunton was under no duty to advise Vega, and indeed, may have felt presumptuous had he done so, assuming Dunton was in fact aware of Vega's plans.

Accordingly, the Court concludes that Dunton has effectively exercised his right granted under the will to purchase the subject property for $1,000,000.00. Closing will be scheduled within thirty days from the entry of an order directing the executor to convey the property to G. Raynor Dunton, III.

*What Are Vega's Rights?*

Alga informed Vega's agent on October 10, 1988, that Dunton's rights were terminated, that Alga had the primary contract, and instructed Vega to proceed accordingly. If Alga did not know on October 10th that Dunton disputed Alga's termination, Alga knew when he received Dunton's letter posted October 22nd. Ghadban, for Vega, testified that it was in reliance upon Alga's representations that he proceeded as instructed and expended various sums in development plans. He stated that had he been informed of Dunton's efforts, he would have brought his own efforts to a halt.

The executor's actions are baffling. Knowing of Dunton's position, he nevertheless allows Vega to go forward at some obvious expense. Although not an attorney, as he acknowledged repeatedly in his testimony, he nevertheless drafted and interpreted a legal instrument and made important legal decisions which others relied upon. He urges the Court to support his interpretation of the will and adopt the position he advances, the practical effect of which is to deny the testator's intent, and the beneficiaries of Article V $70,000.00.

Alga failed to disclose material facts to Vega. Vega acted in reliance upon Alga. Vega was justified in relying upon Alga. Alga was, in effect, the seller. As Vega's counsel notes, only Alga, and perhaps Whay, possessed the essential information which was kept from Vega.

The conclusion this Court of equity must come to is inescapable. Alga is liable to Vega for its reasonable expenses and costs, including counsel fees, incurred after October 10, 1988, in its quest to acquire this property. An evidentiary hearing will be scheduled at counsels' convenience to determine the amount unless counsel can reach agreement.